1  **AMBER BAYLOR**
   California Bar No. 248196
2  **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
   225 Broadway, Suite 900
3  San Diego, California 92101-5008
   Telephone: (619) 234-8467 ext. 3737/3723
4

5  Attorneys for Mr. Mateo

6

7

8                    UNITED STATES DISTRICT COURT

9                   SOUTHERN DISTRICT OF CALIFORNIA

10                  **(HONORABLE BARRY T. MOSKOWITZ)**

11  UNITED STATES OF AMERICA,         )  Criminal No. 07CR3276-BTM
                                      )
12              Plaintiff,            )  Date: January 25, 2008
                                      )  Time: 1:30 p.m.
13  v.                                )
                                      )  STATEMENT OF FACTS AND MEMORANDUM
14  MIGEUL MATEO                      )  OF POINTS AND AUTHORITIES
                                      )  IN SUPPORT OF DEFENDANT'S MOTIONS
15              Defendant.            )
                                      )
16  _____         **I.**

17                     **STATEMENT OF FACTS**

18          The following statement of facts and facts further cited in this motion are based primarily on

19  agents' reports received to date from the court. Mr. Mateo in no way admits the truth of these facts nor their

20  accuracy as cited in these motions. Mr. Mateo reserves the right to challenge the truth and accuracy of these

21  facts in any subsequent pleadings or during any further proceedings.

22          Mr. Mateo was found by United States Border Patrol Agent John G. Coyle, Jr. near San

23  Ysidro, California on March 10, 2007. Upon his arrest he was taken to the Imperial Beach Border Patrol

24  Station. He was later transported to San Diego Sheriff's Central Jail on March 15, 2007, where he was

25  detained further. Immigration and Customs Enforcement agent Joseph Ferma initiated an interrogation of

26  Mr. Mateo while he was still in custody in San Diego. On September 7, 2007, Mr. Mateo was taken to

27  Immigration and Customs Enforcement where he was again interrogated.

28          On December 5, 2007, a January 2007 grand jury returned an indictment against Mr. Mateo.

                                                          07CR3276

1    Mr. Mateo is charged with being found in the United States in violation of 8 U.S.C. §§ 1326 (a) and (b).The

2    indictment alleges Mr. Mateo was removed from the United States subsequent to September 21, 2005.

3                                                    **II.**

4    **THE INDICTMENT SHOULD BE DISMISSED BECAUSE JUDGE BURNS'S**
     **INSTRUCTIONS AS A WHOLE PROVIDED TO THE JANUARY 2007 GRAND JURY RUN**

5    **AFOUL OF BOTH *NAVARRO-VARGAS* AND *WILLIAMS* AND VIOLATE THE FIFTH**
     **AMENDMENT BY DEPRIVING MR. MATEO OF THE TRADITIONAL FUNCTIONING OF**

6    **THE GRAND JURY**

7    **A.         Introduction.**

8                The indictment in the instant case was returned by the January 2007 grand jury.  See CR at

9    7.[1]  That grand jury was instructed by the Honorable Larry A. Burns, United States District Court Judge on

10   January 11, 2007.  See Reporter's Partial Transcript of the Proceedings, dated January 11, 2007, a copy of

11   which is attached hereto as Exhibit A.  Judge Burns's instructions to the impaneled grand jury deviate from

12   the instructions at issue in the major Ninth Circuit cases challenging a form grand jury instruction previously

13   given in this district in several ways.[2]  These instructions compounded Judge Burns's erroneous instructions

14   and comments to prospective grand jurors during voir dire of the grand jury panel, which immediately

15   preceded the instructions at Ex. A.  See Reporter's Transcript of Proceedings, dated January 11, 2007, a copy

16   of which is attached hereto as Exhibit B.[3]

17              **1.   Judge Burns Instructed Grand Jurors That Their Singular Duty**
                      **Is to Determine Whether or Not Probable Cause Exists and That**

18                    **They Have No Right to Decline to Indict When the Probable**
                      **Cause Standard Is Satisfied.**

19

20              After repeatedly emphasizing to the grand jurors that probable cause determination was their

21

22

23
     ─────────────────────

          [1]  "CR" refers to the Clerk's Record in Case Number 07cr1905-H.
24

          [2]  See, e.g., United States v. Cortez-Rivera, 454 F.3d 1038 (9th Cir. 2006); United States v. Navarro-
25   Vargas, 408 F.3d 1184 (9th Cir.) (en banc), cert. denied, 126 S. Ct. 736 (2005) (Navarro-Vargas II); United
     States v. Navarro-Vargas, 367 F.3d 896 (9th Cir. 2004)(Navarro-Vargas I); United States v. Marcucci, 299
26   F.3d 1156 (9th Cir. 2002) (per curiam).

27       [3]  The transcript of the voir dire indicates that grand jurors were shown a video presentation on the role
     of the grand jury.  Mr. Mateo requests that the video presentation be produced.  See United States v. Alter,
28   482 F.2d 1016, 1029 n.21 (9th Cir. 1973) ("[t]he proceedings before the grand jury are secret, but the ground
     rules by which the grand jury conducts those proceedings are not.").

sole responsibility, see Ex. A at 3, 3-4, 5,[4] Judge Burns instructed the grand jurors that they were forbidden "from judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a federal law or should not be a federal law designating certain activity [as] criminal is not up to you." See id. at 8.  The instructions go beyond that, however, and tell the grand jurors that, should "you disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though the evidence may be insufficient.'"  See id. at 8-9.  Thus, the instruction flatly bars the grand jury from declining to indict because the grand jurors disagree with a proposed prosecution.

Immediately before limiting the grand jurors' powers in the way just described, Judge Burns referred to an instance in the grand juror selection process in which he excused three potential jurors.  See id. at 8.

> I've gone over this with a couple of people.  You understood from the questions and answers that a couple of people were excused, I think three in this case, because they could not adhere to the principle that I'm about to tell you.

Id.  That "principle" was Judge Burns's discussion of the grand jurors' inability to give effect to their disagreement with Congress.  See id. at 8-9.  Thus, Judge Burns not only instructed the grand jurors on his view of their discretion; he enforced that view on pain of being excused from service as a grand juror.

Examination of the recently disclosed voir dire transcript, which contains additional instructions and commentary in the form of the give and take between Judge Burns and various prospective grand jurors, reveals how Judge Burns's emphasis of the singular duty is to determine whether or not probable cause exists and his statement that grand jurors they cannot judge the wisdom of the criminal laws enacted by Congress merely compounded an erroneous series of instructions already given to the grand jury venire.  In one of his earliest substantive remarks, Judge Burns makes clear that the grand jury's sole function is probable cause determination.

> [T]he grand jury is determining really two factors: "do we have a reasonable belief that a crime was committed?  And second, do we have a reasonable belief that the person that they propose that we indict committed the crime?"
>
> If the answer is "yes" to both of those, then the case should move forward.

---

[4]  See also id. at 20 ("You're all about probable cause.").

07CR3276

> If the answer to either of the questions is "no," then the grand jury should not hesitate and not indict.

See Ex. B at 8.  In this passage, Judge Burns twice uses the term "should" in a context makes clear that the term is employed to convey instruction: "should" cannot reasonably be read to mean optional when it addresses the obligation not to indict when the grand jury has no "reasonable belief that a crime was committed" or if it has no "reasonable belief that the person that they propose that we indict committed the crime."

Equally revealing are Judge Burns's interactions with two potential grand jurors who indicated that, in some unknown set of circumstances, they might decline to indict even where there was probable cause.  Because of the redactions of the grand jurors' names, Mr. Mateo will refer to them by occupation.  One is a retired clinical social worker (hereinafter CSW), and the other is a real estate agent (hereinafter REA).  The CSW indicated a view that no drugs should be considered illegal and that some drug prosecutions were not an effective use of resources.  See id. at 16.  The CSW was also troubled by certain unspecified immigration cases.  See id.

Judge Burns made no effort to determine what sorts of drug and immigration cases troubled the CSW.  He never inquired as to whether the CSW was at all troubled by the sorts of cases actually filed in this district, such as drug smuggling cases and cases involving reentry after deportation and alien smuggling.  Rather, he provided instructions suggesting that, in any event, any scruples CSW may have possessed were simply not capable of expression in the context of grand jury service.

> Now, the question is can you fairly evaluate [drug cases and immigration cases]?  Just as the defendant is ultimately entitled to a fair trial and the person that's accused is entitled to a fair appraisal of the evidence of the case that's in front of you, so, too, is the United States entitled to a fair judgment.  If there's probable cause, then the case should go forward.  *I wouldn't want you to say,* "well, yeah, there's probable cause, but I still don't like what our government is doing.  I disagree with these laws, so I'm not going to vote for it to go forward."  If that is your frame of mind, the probably you shouldn't serve.  Only you can tell me that.

See id. at 16-17 (emphasis added).  Thus, without any sort of context whatsoever, Judge Burns let the grand juror know that he would not want him or her to decline to indict in an individual case where the grand juror "[didn't] like what our government is doing," see id. at 17, but in which there was probable cause.  See Id.

07CR3276

Such a case "should go forward." See id. Given that blanket proscription on grand juror discretion, made

manifest by Judge Burns's use of the pronoun "I", the CSW indicated that it "would be difficult to support

a charge even if [the CSW] thought the evidence warranted it." See id. Again, Judge Burns's question

provided no context; he inquired regarding "a case," a term presumably just as applicable to possession of

a small amount of medical marijuana as kilogram quantities of methamphetamine for distribution. Any

grand juror listening to this exchange could only conclude that there was *no* case in which Judge Burns

would permit them to vote "no bill" in the face of a showing probable cause.

Just in case there may have been a grand juror that did not understand his or her inability to

exercise anything like prosecutorial discretion, Judge Burns drove the point home in his exchange with REA.

REA first advised Judge Burns of a concern regarding the "disparity between state and federal law"

regarding "medical marijuana." See id. at 24. Judge Burns first sought to address REA's concerns about

medical marijuana by stating that grand jurors, like trial jurors, are simply forbidden from taking penalty

considerations into account.

> Well, those things -- the consequences of your determination shouldn't
> concern you in the sense that penalties or punishment, things like that -- we
> tell trial jurors, of course, that they cannot consider the punishment or the
> consequence that Congress has set for these things. We'd ask you to also
> abide by that. We want you to make a business-like decision of whether there
> was a probable cause. . . .

Id. at 24-25. Having stated that REA was to "abide" by the instruction given to trial jurors, Judge Burns

went on to suggest that REA recuse him or herself from medical marijuana cases. See id. at 25.

In response to further questioning, REA disclosed REA's belief "that drugs should be legal."

See id. That disclosure prompted Judge Burns to begin a discussion that ultimately led to an instruction that

a grand juror is obligated to vote to indict if there is probable cause.

> I can tell you sometimes I don't agree with some of the legal decisions that are
> indicated that I have to make. But my alternative is to vote for someone
> different, vote for someone that supports the policies I support and get the
> law changed. It's not for me to say, "well, I don't like it. So I'm not going to
> follow it here."
>
> You'd have a similar obligation as a grand juror even though you might have
> to grit your teeth on some cases. Philosophically, if you were a member of
> congress, you'd vote against, for example, criminalizing marijuana. I don't
> know if that's it, but you'd vote against criminalizing some drugs.
>
> That's not what your prerogative is here. You're prerogative instead is to act

> like a judge and say, "all right.  This is what I've to  deal with objectively.
> Does it seem to me that a crime was committed?  Yes.  Does it seem to me
> that this person's involved?  It does."  *And then your obligation, if you find*
> *those to be true, would be to vote in favor of the case going forward.*

Id. at 26-27 (emphasis added).  Thus, the grand juror's duty is to conduct a simple two part test, which, if

both questions are answered in the affirmative, lead to an "obligation" to indict.

Having set forth the duty to indict, and being advised that REA was "uncomfortable" with

that paradigm, Judge Burns then set about to ensure that there was no chance of a deviation from the

obligation to indict in every case in which there was probable cause.

> The Court: Do you think you'd be inclined to let people go in drug cases even
> though you were convinced there was probable cause they committed a drug
> offense?
> REA: It would depend on the case.
> The Court: Is there a chance that you would do that?
> REA: Yes.
> The Court: I appreciate your answers.  I'll excuse you at this time.

Id. at 27.  Two aspects of this exchange are crucial.  First, REA plainly does not intend to act solely on his

political belief in decriminalization – whether he or she would indict "depend[s] on the case," see id., as it

should.  Because REA's vote "depend[s] on the case," see id., it is necessarily true that REA would vote to

indict in some (perhaps many or even nearly all) cases in which there was probable cause.  Again, Judge

Burns made no effort to explore REA's views; he did not ascertain what sorts of cases would prompt REA

to hesitate.  The message is clear: it does not matter what type of case might prompt REA's reluctance to

indict because, once the two part test is satisfied, the "obligation" is "to vote in favor of the case going

forward."[5]  See id. at 27.  That is why even the "chance," see id., that a grand juror might not vote to indict

was too great a risk to run.

### 2.  The Instructions Posit a Non-Existent Prosecutorial Duty to Offer Exculpatory Evidence.

---

[5]  This point is underscored by Judge Burns's explanation to the Grand Jury that a magistrate judge
will have determined the existence of probable cause "in most circumstances" before it has been presented
with any evidence.  See Ex. A at 6.  This instruction created an imprimatur of finding probable cause in each
case because had a magistrate judge not so found, the case likely would not have been presented to the Grand
Jury for indictment at all.  The Grand Jury was informed that it merely was redundant to the magistrate court
"in most circumstances."  See id.  This instruction made the grand jury more inclined to indict irrespective
of the evidence presented.

07CR3276

In addition to his instructions on the authority to choose not to indict, Judge Burns also assured the grand jurors that prosecutors would present to them evidence that tended to undercut probable cause. See Ex. A at 20.[6]

> Now, again, this emphasizes the difference between the function of the grand jury and the trial jury. You're all about probable cause. If you think that there's evidence out there that might cause you to say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence.*

Id. (emphasis added).

The antecedent to this instruction is also found in the voir dire. After advising the grand jurors that "the presentation of evidence to the grand jury is necessarily one-sided," see Ex. B at 14, Judge Burns gratuitously added that "[his] experience is that the prosecutors don't play hide-the-ball. If there's something adverse or that cuts against the charge, you'll be informed of that. They have a duty to do that." See id. Thus, Judge Burns unequivocally advised the grand jurors that the government would present any evidence that was "adverse" or "that cuts against the charge." See id.

---

[6] These instructions were provided in the midst of several comments that praised the United States attorney's office and prosecutors in general. Judge Burns advised the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and . . . they'll act in good faith in all matters presented to you." See Ex. A at 27. The instructions delivered during voir dire go even further. In addressing a prospective grand juror who revealed "a strong bias for the U.S. Attorney, whatever cases they might bring," see Ex. B at 38, Judge Burns affirmatively endorsed the prospective juror's view of the U.S. Attorney's office, even while purporting to discourage it: "frankly, I agree with the things you are saying. They make sense to me." See id. at 43. See also id. at 40 ("You were saying that you give a presumption of good faith to the U.S. Attorney and assume, quite logically, that they're not about the business of trying to indict innocent people or people that they believe to be innocent or the evidence doesn't substantiate the charges against.").

Judge Burns's discussion of his once having been a prosecutor before the Grand Jury compounded the error inherent in his praising of the government attorneys. See Ex. A at 9-10. Judge Burns's instructions implied that as a prior prosecutor and current "jury liaison judge," see id. at 8, he would not allow the government attorneys to act inappropriately or to present cases for indictment where no probable cause existed.

In addition, while Judge Burns instructed the Grand Jury that it had the power to question witnesses, Judge Burns's instructions also told the Grand Jury that it should "be deferential to the U.S. Attorney if there is an instance where the U.S. Attorney thinks a question ought not to be asked." See Ex. A at 12. As the dissent in Navarro-Vargas pointed out, "the grand jury's independence is diluted by [such an] instruction, which encourages deference to prosecutors." Navarro-Vargas, 408 F.3d at 1215. The judge's admonition that his statement was only "advice," see Ex A at 12, does not cure the error as courts regularly presume grand jurors follow instructions provided to them by the court. See id. at 1202, n.23 ("We must presume that grand jurors will follow instructions because, in fact, we are prohibited from examining jurors to verify whether they understood the instruction as given and then followed it.").

07CR3276

**B.      *Navarro-Vargas* Establishes Limits on the Ability of Judges to Constrain the Powers of the Grand Jury, Which Judge Burns Far Exceeded in His Instructions as a Whole During Impanelment.**

The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions given to grand jurors in the Southern District of California. See Navarro-Vargas II, 408 F.3d 1184. While the Ninth Circuit has thus far (narrowly) rejected such challenges, it has, in the course of adopting a highly formalistic approach[2] to the problems posed by the instructions, endorsed many of the substantive arguments raised by the defendants in those cases. The district court's instructions cannot be reconciled with the role of the grand jury as set forth in Navarro-Vargas II. Taken together, the voir dire of and instructions given to the January 2007 Grand Jury, go far beyond those at issue in Navarro-Vargas, taking a giant leap in the direction of a bureaucratic, deferential grand jury, focused solely upon probable cause determinations and utterly unable to exercise any quasi-prosecutorial discretion. That is not the institution the Framers envisioned. See United States v. Williams, 504 U.S. 36, 49 (1992).

For instance, with respect to the grand jury's relationship with the prosecution, the Navarro-Vargas II majority acknowledges that the two institutions perform similar functions: "'the public prosecutor, in deciding whether a particular prosecution shall be instituted or followed up, performs much the same function as a grand jury.'" Navarro-Vargas II, 408 F.3d at 1200 (quoting Butz v. Economou, 438 U.S. 478, 510 (1978)). Accord United States v. Navarro-Vargas, 367 F.3d 896, 900 (9th Cir. 2004) (Navarro-Vargas I)(Kozinski, J., dissenting) (The grand jury's discretion in this regard "is most accurately described as prosecutorial." ). See also Navarro-Vargas II, 408 F.3d at 1213 (Hawkins, J., dissenting). It recognizes that the prosecutor is not obligated to proceed on any indictment or presentment returned by a grand jury, id., but also that "the grand jury has no obligation to prepare a presentment or to return an indictment drafted by the prosecutor." Id. See Niki Kuckes, The Democratic Prosecutor: Explaining the Constitutional Function of the Federal Grand Jury, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's discretion not to indict was "'arguably . . . the most important attribute of grand jury review from the perspective of those who insisted that a grand jury clause be included in the Bill of Rights'") (quoting Wayne LaFave et al., Criminal

---

[2] See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the majority because "[t]he instruction's use of the word 'should' is most likely to be understood as imposing an inflexible duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").

Procedure § 15.2(g) (2d ed. 1999)).

Indeed, the <u>Navarro-Vargas II</u> majority agrees that the grand jury possesses all the attributes set forth in <u>Vasquez v. Hillery</u>, 474 U.S. 254 (1986).  <u>See id.</u>

> The grand jury thus determines not only whether probable cause exists, but also whether to "charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a non-capital offense – all on the basis of the same facts.  And, significantly, the grand jury may refuse to return an indictment even "'where a conviction can be obtained.'"

<u>Id.</u> (quoting <u>Vasquez</u>, 474 U.S. at 263).  The Supreme Court has itself reaffirmed <u>Vasquez</u>'s description of the grand jury's attributes in <u>Campbell v. Louisiana</u>, 523 U.S. 392 (1998), noting that the grand jury "controls not only the initial decision to indict, but also significant questions such as how many counts to charge and whether to charge a greater or lesser offense, including the important decision whether to charge a capital crime."  <u>Id.</u> at 399 (citing <u>Vasquez</u>, 474 U.S. at 263).  Judge Hawkins notes that the <u>Navarro-Vargas II</u> majority accepts the major premise of <u>Vasquez</u>: "the majority agrees that a grand jury has the power to refuse to indict someone even when the prosecutor has established probable cause that this individual has committed a crime."  <u>See id.</u> at 1214 (Hawkins, J., dissenting).  <u>Accord</u> <u>Navarro-Vargas I</u>, 367 F.3d at 899 (Kozinski, J., dissenting); <u>United States v. Marcucci</u>, 299 F.3d 1156, 1166-73 (9th Cir. 2002) (per curiam) (Hawkins, J., dissenting).  In short, the grand jurors' prerogative not to indict enjoys strong support in the Ninth Circuit.  But not in Judge Burns's instructions.

**C.      Judge Burns's Instructions Forbid the Exercise of Grand Jury Discretion Established in Both *Vasquez* and *Navarro-Vargas II*.**

The <u>Navarro-Vargas II</u> majority found that the instruction in that case "leave[s] room for the grand jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its previous decision in <u>Marcucci</u>.  <u>Marcucci</u> reasoned that the instructions do not mandate that grand jurors indict upon every finding of probable cause because the term "should" may mean "what is probable or expected."  299 F.3d at 1164 (citation omitted).  That reading of the term "should" makes no sense in context, as Judge Hawkins ably pointed out.  <u>See</u> <u>Navarro-Vargas II</u>, 408 F.3d at 1210-11 (Hawkins, J., dissenting) ("The instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").  <u>See</u>

07CR3276

1  also id. ("The 'word' should is used to express a duty [or] obligation.") (quoting The Oxford American

2  Diction and Language Guide 1579 (1999) (brackets in original)).

3          The debate about what the word "should" means is irrelevant here; the instructions here make

4  no such fine distinction.  The grand jury instructions make it painfully clear that grand jurors simply may

5  not choose not to indict in the event of what appears to them to be an unfair application of the law: should

6  "you disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote

7  against indicting even though I think that the evidence is sufficient'...."  See Ex. A at 8-9.  Thus, the

8  instruction flatly bars the grand jury from declining to indict because they disagree with a proposed

9  prosecution. No grand juror would read this language as instructing, or even allowing, him or her to assess

10 "the need to indict." Vasquez, 474 U.S. at 264.

11         While Judge Burns used the word "should" instead of "shall" during voir dire with respect

12 to whether an indictment was required if probable cause existed, see Ex. B at 4, 8, n context, it is clear that

13 he could only mean "should" in the obligatory sense.  For example, when addressing a prospective juror,

14 Judge Burns not only told the jurors that they "should" indict if there is probable cause, he told them that

15 if there is not probable cause, "then the grand jury should hesitate and not indict." See id. at 8.  At least in

16 context, it would strain credulity to suggest that Judge Burns was using "should" for the purpose of "leaving

17 room for the grand jury to [indict] even if it finds [no] probable cause."  See Navarro-Vargas, 408 F.3d at

18 1205.  Clearly he was not.

19         The full passage cited above effectively eliminates any possibility that Judge Burns intended

20 the Navarro-Vargas spin on the word "should."

21             [T]he grand jury is determining really two factors: "do we have a reasonable
               belief that a crime was committed?  And second, do we have a reasonable
22             belief that the person that they propose that we indict committed the crime?"

23             If the answer is "yes" to both of those, then the case should move forward.
               If the answer to either of the questions is "no," then the grand jury should not
24             hesitate and not indict.

25
26 See Ex. B at 8.  Of the two sentences containing the word "should," the latter of the two essentially states

27 that if there is no probable cause, you should not indict.  Judge Burns could not possibly have intended to

28 "leav[e] room for the grand jury to [indict] even if it finds [no] probable cause."  See Navarro-Vargas, 408

1   F.3d at 1205 (citing <u>Marcucci</u>, 299 F.3d at 1159).  That would contravene the grand jury's historic role of

2   protecting the innocent.  <u>See, e.g.</u>, <u>United States v. Calandra</u>, 414 U.S. 338, 343 (1974) (The grand jury's

3   "responsibilities continue to include both the determination whether there is probable cause and the

4   protection of citizens against unfounded criminal prosecutions.") (citation omitted).

5         By the same token, if Judge Burns said that "the case should move forward" if there is

6   probable cause, but intended to "leav[e] room for the grand jury to dismiss even if it finds probable cause,"

7   <u>see</u> <u>Navarro-Vargas</u>, 408 F.3d at 1205 (citing <u>Marcucci</u>, 299 F.3d at 1159), then he would have to have

8   intended two different meanings of the word "should" in the space of two consecutive sentences.  That could

9   not have been his intent.  But even if it were, no grand jury could ever have had that understanding.[8]  Jurors

10  are not presumed to be capable of sorting through internally contradictory instructions.  <u>See generally</u> <u>United</u>

11  <u>States v. Lewis</u>, 67 F.3d 225, 234 (9th Cir. 1995) ("where two instructions conflict, a reviewing court cannot

12  presume that the jury followed the correct one") (citation, internal quotations and brackets omitted).

13        Lest there be any room for ambiguity, on no less than four occasions, Judge Burns made it

14  explicitly clear to the grand jurors that "should" was not merely suggestive, but obligatory:

15        **(1)**    The first occasion occurred in the following exchange when Judge Burns conducted

16  voir dire and excused a potential juror (CSW):

17              The Court: . . . If there's probable cause, then the case should go forward.  I
                wouldn't want you to say, "Well, yeah, there's probable cause.  But I still don't
18              like what the government is doing.  I disagree with these laws, so I'm not
                going to vote for it to go forward."  If that's your frame of mind, then
19              probably you shouldn't serve.  Only you can tell me that.
                Prospective Juror: Well, I think I may fall in that category.
20              The Court: In the latter category?
                Prospective Juror: Yes.
21              The Court: Where it would be difficult for you to support a charge even if
                you thought the evidence warranted it?
22              Prospective Juror: Yes.
                The Court: I'm going to excuse you then.
23

24  <u>See</u> Ex. B at 17.  There was nothing ambiguous about the word "should" in this exchange with a prospective

25  juror.  Even if the prospective juror did not like what the government was doing in a particular case, that case

26

27        [8]  This argument does not turn on Mr. Mateo's view that the <u>Navarro-Vargas</u>/<u>Marcucci</u> reading of the
    word "should" in the model instructions is wildly implausible.  Rather, it turns on the context in which the
28  word is employed by Judge Burns in his unique instructions, context which eliminates the <u>Navarro-</u>
    <u>Vargas</u>/<u>Marcucci</u> reading as a possibility.

1   "should go forward" and Judge Burns expressly disapproved of any vote that might prevent that. <u>See id.</u> ("I

2   wouldn't want you [to vote against such a case]"). The sanction for the possibility of independent judgment

3   was dismissal, a result that provided full deterrence of that juror's discretion and secondary deterrence as to

4   the exercise of discretion by any other prospective grand juror.

5          **(2)**     In an even more explicit example of what "should" meant, Judge Burns makes clear

6   that it there is an unbending obligation to indict if there is probable cause. Grand jurors have no other

7   prerogative.

8   Court            . . . It's not for me to say, "Well, I don't like it. So I'm not going to follow it here."

9                    You'd have a similar *obligation* as a grand juror even though you might have
                     to grit your teeth on some cases. Philosophically, if you were a member of
10                   Congress, you'd vote against, for example, criminalizing marijuana. I don't
                     know if that's it, but you'd vote against criminalizing some drugs.

11
                     That's not what your *prerogative* is here. Your prerogative instead is act like
12                   a judge and to say, "All right. This is what I've got to deal with objectively.
                     Does it seem to me that a crime was committed? Yes. Does it seem to me
13                   that this person's involved? It does." *And then your obligation, if you find
                     those things to be true, would be to vote in favor of the case going forward.*

14

15  <u>Id.</u> at 26-27 (emphasis added). After telling this potential juror (REA) what his obligations and prerogatives

16  were, the Court inquired as to whether "you'd be inclined to let people go on drug cases even though you

17  were convinced there was probable cause they committed a drug offense?" <u>Id.</u> at 27. The potential juror

18  responded: "It would depend on the case." <u>Id.</u> Nevertheless, that juror was excused. <u>Id.</u> at 28. Again, in this

19  context, and contrary to the situation in <u>Navarro-Vargas</u>, "should" means "shall"; it is obligatory, and the

20  juror has no prerogative to do anything other than indict if there is probable cause.

21         Moreover, as this example demonstrates, the issue is not limited to whether the grand jury

22  believes a particular law to be "unwise." This juror said that any decision to indict would not depend on the

23  law, but rather it would "depend on the case." Thus, it is clear that Judge Burns's point was that if a juror

24  could not indict on probable cause for *every* case, then that juror was not fit for service. It is equally clear

25  that the prospective juror did not dispute the "wisdom of the law;" he was prepared to indict under some

26  factual scenarios, perhaps many. But Judge Burns did not pursue the question of what factual scenarios

27  troubled the prospective jurors, because his message is that there is no discretion not to indict.

28  //

**(3)**    As if the preceding examples were not enough, Judge Burns continued to pound the point home that "should" meant "shall" when he told another grand juror during voir dire: "[W]hat I have to insist on is that you follow the law that's given to us by the United States Congress.  We enforce the federal laws here."  See id. at 61.

**(4)** And then again, after swearing in all the grand jurors who had already agreed to indict in every case where there was probable cause, Judge Burns reiterated that "should" means "shall" when he reminded them that "your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient . . . . Instead your *obligation* is . . . not to bring your personal definition of what the law ought to be and try to impose that through applying it in a grand jury setting." See Ex. A at 9.

Moreover, Judge Burns advised the grand jurors that the were forbidden from considering the penalties to which indicted persons may be subject.

> Prospective Juror (REA): ... And as far as being fair, it kind of depends on what the case is about because there is a disparity between state and federal law.
> The Court:  In what regard?
> Prospective Juror: Specifically, medical marijuana.
> The Court:  Well, those things – the consequences of your determination shouldn't concern you in the sense that penalties or punishment, things like that – *we tell trial jurors, of course, that they cannot consider the punishment or the consequence that Congress has set for these things.  We'd ask you to also abide by that.*  We want you to make a business-like decision of whether there was a probable cause. ...

See Ex. B at 24-25 (emphasis added).  A "business-like decision of whether there was a probable cause" would obviously leave no role for the consideration of penalty information.

The Ninth Circuit previously rejected a claim based upon the proscription against consideration of penalty information based upon the same unlikely reading of the word "should" employed in Marcucci.  See United States v. Cortez-Rivera, 454 F.3d 1038, 1040-41 (9th Cir. 2006).  Cortez-Rivera is inapposite for two reasons.  First, Judge Burns did not use the term "should" in the passage quoted above.  Second, that context, as well as his consistent use of a mandatory meaning in employing the term, eliminate the ambiguity (if there ever was any) relied upon by Cortez-Rivera.  The instructions again violate Vasquez, which plainly authorized consideration of penalty information.  See 474 U.S. at 263.

Noting can mask the undeniable fact that Judge Burns explicitly instructed the jurors time and time again that they had a duty, an obligation, and a singular prerogative to indict each and every case

where there was probable cause.  These instructions go far beyond the holding of <u>Navarro-Vargas</u> and stand in direct contradiction of the Supreme Court's decision in <u>Vasquez</u>.  Indeed, it defies credulity to suggest that a grand juror hearing these instructions, and that voir dire, could possibly believe what the Supreme Court held in <u>Vasquez</u>:

> The grand jury does not determine only that probable cause exists to believe that a defendant committed a crime, or that it does not.  In the hands of the grand jury lies the power to charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a non-capital offense – all on the basis of the same facts. Moreover, "[t]he grand jury is not bound to indict in every case where a conviction can be obtained."

474 U.S. at 263 (quoting <u>United States v. Ciambrone</u>, 601 F.2d 616, 629 (2nd Cir. 1979) (Friendly, J., dissenting)); <u>accord</u> <u>Campbell v. Louisiana</u>, 523 U.S. 392, 399 (1998) (The grand jury "controls not only the initial decision to indict, but also significant decisions such as how many counts to charge and whether to charge a greater or lesser offense, including the important decision whether to charge a capital crime."). Nor would the January 2007 grand jury ever believe that it was empowered to assess the "the need to indict." <u>See</u> <u>id.</u> at 264.  Judge Burns's grand jury is not <u>Vasquez</u>'s grand jury.  The instructions therefore represent structural constitutional error "that interferes with the grand jury's independence and the integrity of the grand jury proceeding." <u>See</u> <u>United States v. Isgro</u>, 974 F.2d 1091, 1094 (9th Cir. 1992).  The indictment must therefore be dismissed.  <u>Id.</u>

The <u>Navarro-Vargas II</u> majority's faith in the structure of the grand jury *is not* a cure for the instructions excesses.  The <u>Navarro-Vargas II</u> majority attributes "[t]he grand jury's discretion -- its independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of its decisions." 408 F.3d at 1200.  As a result, the majority discounts the effect that a judge's instructions may have on a grand jury because "it is the *structure* of the grand jury process and its *function* that make it independent." <u>Id.</u> at 1202 (emphases in the original).

Judge Hawkins sharply criticized this approach.  The majority, he explains, "believes that the 'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and unreviewability of many of its decisions -- sufficiently protects that power." <u>See</u> <u>id.</u> at 1214 (Hawkins, J., dissenting).  The flaw in the majority's analysis is that "[i]nstructing a grand jury that it lacks power to do anything beyond

1  making a probable cause determination ... unconstitutionally undermines the very structural protections that

2  the majority believes save[] the instruction." Id. After all, it is an "'almost invariable assumption of the law

3  that jurors follow their instructions.'" Id. (quoting Richardson v. Marsh, 481 U.S. 200, 206 (1987)). If that

4  "invariable assumption" were to hold true, then the grand jurors could not possibly fulfill the role described

5  in Vasquez. Indeed, "there is something supremely cynical about saying that it is fine to give jurors

6  erroneous instructions because nothing will happen if they disobey them." Id.

7           In setting forth Judge Hawkins' views, Mr. Mateo understands that this Court may not adopt

8  them solely because the reasoning that supports them is so much more persuasive than the majority's

9  sophistry. Rather, he sets them forth to urge the Court *not to extend* what is already untenable reasoning.

10          Here, again, the question is not an obscure interpretation of the word "should", especially in

11 light of the instructions and commentary by Judge Burns during voir dire discussed above - unaccounted for

12 by the Court in Navarro-Vargas II because they had not yet been disclosed to the defense, but an absolute

13 ban on the right to refuse to indict that directly conflicts with the recognition of that right in Vasquez,

14 Campbell, and both Navarro-Vargas II opinions. Navarro-Vargas II is distinguishable on that basis, but not

15 only that.

16          Judge Burns did not limit himself to denying the grand jurors the power that Vasquez plainly

17 states they enjoy. He also excused prospective grand jurors who might have exercised that Fifth Amendment

18 prerogative, excusing "three [jurors] in this case, because they could not adhere to [that] principle...." See

19 Ex. A at 8; Ex. B at 17, 28. The structure of the grand jury and the secrecy of its deliberations cannot

20 embolden grand jurors who are no longer there, likely because they expressed their willingness to act as the

21 conscience of the community. See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (a

22 grand jury exercising its powers under Vasquez "serves ... to protect the accused from the other branches

23 of government by acting as the 'conscience of the community.'") (quoting Gaither v. United States, 413 F.2d

24 1061, 1066 & n.6 (D.C. Cir. 1969)). The federal courts possess only "very limited" power "to fashion, on

25 their own initiative, rules of grand jury procedure," United States v. Williams, 504 U.S. 36, 50 (1992), and,

26 here, Judge Burns has both fashioned his own rules and enforced them.

27 //

28 **D.        The Instructions Conflict with Williams' Holding That There Is No Duty**

-15-                                                          07CR3276

**to Present Exculpatory Evidence to the Grand Jury.**

In <u>Williams</u>, the defendant, although conceding that it was not required by the Fifth Amendment, argued that the federal courts should exercise their supervisory power to order prosecutors to disclose exculpatory evidence to grand jurors, or, perhaps, to find such disclosure required by Fifth Amendment common law. <u>See</u> 504 U.S. at 45, 51. <u>Williams</u> held that "as a general matter at least, no such 'supervisory' judicial authority exists." <u>See id.</u> at 47. Indeed, although the supervisory power may provide the authority "to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by this Court and by Congress to ensure the integrity of the grand jury's functions,'" <u>id.</u> at 46 (citation omitted), it does not serve as "a means of *prescribing* such standards of prosecutorial conduct in the first instance." <u>Id.</u> at 47 (emphasis added). The federal courts possess only "very limited" power "to fashion, on their own initiative, rules of grand jury procedure." <u>Id.</u> at 50. As a consequence, <u>Williams</u> rejected the defendant's claim, both as an exercise of supervisory power and as Fifth Amendment common law. <u>See id.</u> at 51-55.

Despite the holding in <u>Williams</u>, the instructions here assure the grand jurors that prosecutors would present to them evidence that tended to undercut probable cause. <u>See</u> Ex. A at 20.

> Now, again, this emphasizes the difference between the function of the grand jury and the trial jury. You're all about probable cause. If you think that there's evidence out there that might cause you say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence.*

<u>Id.</u> (emphasis added). Moreover, the district court later returned to the notion of the prosecutors and their duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." <u>See id.</u> at 27. The Ninth Circuit has already concluded it is likely this final comment is "unnecessary." <u>See</u> <u>Navarro-Vargas</u>, 408 F.3d at 1207.

This particular instruction has a devastating effect on the grand jury's protective powers, particularly if it is not true. It begins by emphasizing the message that <u>Navarro-Vargas II</u> somehow

1    concluded was not conveyed by the previous instruction: "You're all about probable cause." See Ex. A at

2    20. Thus, once again, the grand jury is reminded that they are limited to probable cause determinations (a

3    reminder that was probably unnecessary in light of the fact that Judge Burns had already told the grand jurors

4    that they likely would be excused if they rejected this limitation). The instruction goes on to tell the grand

5    jurors that they should consider evidence that undercuts probable cause, but also advises the grand jurors

6    that the prosecutor will present it. The end result, then, is that grand jurors should consider evidence that

7    goes against probable cause, but, if none is presented by the government, they can presume that there is

8    none. After all, "in most instances, the U.S. Attorneys are duty-bound to present evidence that cuts against

9    what they may be asking you to do if they're aware of that evidence." See id. Moreover, during voir dire,

10   Judge Burns informed the jurors that "my experience is that the prosecutors don't play hide-the-ball. If

11   there's something adverse or that cuts against the charge, you'll be informed of that. *They have a duty to do*

12   *that*." See Ex. B at 14-15 (emphasis added). Thus, if the exculpatory evidence existed, it necessarily would

13   have been presented by the "duty-bound" prosecutor, because the grand jurors "can expect that the U.S.

14   Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll act in good faith

15   in all matters presented to you." See Ex. A at 27.

16          These instructions create a presumption that, in cases where the prosecutor does not present

17   exculpatory evidence, no exculpatory evidence exists. A grand juror's reasoning, in a case in which no

18   exculpatory evidence was presented, would proceed along these lines:

19          (1) I have to consider evidence that undercuts probable cause.

20          (2)    The candid, honest, duty-bound prosecutor would, in good faith, have presented any

21                 such evidence to me, if it existed.

22          (3)    Because no such evidence was presented to me, I may conclude that there is none.

23   Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the

24   evidence presented represents the universe of all available exculpatory evidence; if there was more, the duty-

25   bound prosecutor would have presented it.

26          The instructions, therefore, discourage investigation – if exculpatory evidence were out there,

27   the prosecutor would present it, so investigation is a waste of time – and provide additional support to every

28   probable cause determination: i.e., this case may be weak, but I know that there is nothing on the other side

of the equation because it was not presented.  A grand jury so badly misguided is no grand jury at all under the Fifth Amendment.

### III.

### MOTION TO COMPEL DISCOVERY/PRESERVE EVIDENCE

Counsel for Mr. Mateo **specifically requests a viewing of Mr. Mateo's A-file, a copy of tapes from the alleged deportation hearing, and any signed waiver of <u>Miranda</u> rights prior to September 7, 2007 or videotape of <u>Miranda</u> advisal.**  Mr. Mateo moves for the production of this and the following discovery.  This request is not limited to those items that the prosecutor knows of, but rather includes all discovery listed below that is in the custody, control, care, or knowledge of any "closely related investigative [or other] agencies." <u>See</u> <u>United States v. Bryan</u>, 868 F.2d 1032 (9th Cir. 1989).

(1)  <u>Arrest Reports and Notes</u>.  The defendant also specifically requests that the government turn over all arrest reports, notes and TECS records not already produced that relate to the circumstances surrounding his arrest or any questioning.  This request includes, but is not limited to, any rough notes, records, reports, transcripts, referral slips, or other documents in which statements of the defendant or any other discoverable material is contained.  Such material is discoverable under Fed. R. Crim. P. 16(a)(1)(A) and <u>Brady v. Maryland</u>.  The government must produce arrest reports, investigators' notes, memos from arresting officers, sworn statements, and prosecution reports pertaining to the defendant.  <u>See</u> Fed. R. Crim. P. 16(a)(1)(B) and (E), 26.2 and 12(I); <u>United States v.  Harris</u>, 543 F.2d 1247, 1253 (9th Cir. 1976) (original notes with suspect or witness must be preserved); <u>see also</u> <u>United States v. Anderson</u>, 813 F.2d 1450, 1458 (9th Cir. 1987) (reaffirming <u>Harris</u>' holding).

(2)  <u>Brady Material</u>.  The defendant requests all documents, statements, agents' reports, and tangible evidence favorable to the defendant on the issue of guilt and/or which affects the credibility of the government's case.  <u>Kyles v. Whitley</u>, 514 U.S. 419 (1995).  Under <u>Brady</u>, <u>Kyles</u> and their progeny, impeachment as well as exculpatory evidence falls within the definition of evidence favorable to the accused.  <u>See also</u> <u>United States v. Bagley</u>, 473 U.S. 667 (1985); <u>United States v. Agurs</u>, 427 U.S.

97 (1976).  This includes information obtained from other investigations which exculpates Mr. Mateo.

(3)  Any Information That May Result in a Lower Sentence Under The Guidelines.  The government must also produce this information under Brady v. Maryland.  This request includes any cooperation or attempted cooperation by the defendant as well as any information, including that obtained from other investigations or debriefings, that could affect any base offense level or specific offense characteristic under Chapter Two of the Guidelines.  The defendant also requests any information relevant to a Chapter Three adjustment, a determination of the defendant's criminal history, and information relevant to any other application of the Guidelines.

(4)  The Defendant's Prior Record.  The defendant requests disclosure of his prior record. Fed. R. Crim. P. 16(a)(1)(D).

(5)  Any Proposed 404(b) Evidence.  The government must produce evidence of prior similar acts under Fed. R. Crim. P. 16(a)(1)(E) and Fed.  R.  Evid. 404(b) and 609.  In addition, "upon request of the accused, the prosecution . . . shall provide reasonable notice in advance of trial . . . of the general nature" of any evidence the government proposes to introduce under Fed. R. Evid. 404(b) at trial and the purpose for which introduction is sought.  This applies not only to evidence which the government may seek to introduce in its case-in-chief but also to evidence which the government may use as rebuttal.  See United States v. Vega, 188 F.3d 1150 (9th Cir. 1999).  The defendant is entitled to "reasonable notice" so as to "reduce surprise," preclude "trial by ambush" and prevent the "possibility of prejudice."  Id.; United States v. Perez-Tosta, 36 F.3d 1552,  1560-61 (11th Cir. 1994).  Mr. Mateo requests such reasonable notice at least two weeks before trial so as to adequately investigate and prepare for trial.

(6)  Evidence Seized.  The defendant requests production of evidence seized as a result of any search, either warrantless or with a warrant.  Fed. R. Crim. P. 16(a)(1)(E).

(7)  Request for Preservation of Evidence.  The defendant specifically requests the preservation of any and all physical evidence that may be destroyed, lost, or otherwise put out of the possession, custody, or care of the government and which relates to the arrest or the events leading to the arrest in this case.  This request includes, but is not limited to, the results of any fingerprint analysis, the defendant's personal effects, and any evidence seized from the defendant or any third party in relation to

1    this case.

2        In addition, Mr. Mateo requests that the Assistant United States Attorney assigned to this

3    case oversee a review of all personnel files of each agent involved in the present case for impeachment

4    material. <u>Kyles</u>, 514 U.S. at 419; <u>United States v. Henthorn</u>, 931 F.2d 29 (9th Cir. 1991); <u>United States</u>

5    <u>v. Lacy</u>, 896 F. Supp. 982 (N.D. Ca. 1995). At a minimum, the prosecutor has the obligation to inquire

6    of his or his agents in order to ascertain whether or not evidence relevant to veracity or other

7    impeachment exists.

8        (8) <u>Tangible Objects</u>. The defendant requests the opportunity to inspect and copy as well

9    as test, if necessary, all other documents and tangible objects, including photographs, books, papers,

10   documents, fingerprint analyses, vehicles, or copies of portions thereof, which are material to the defense

11   or intended for use in the government's case-in-chief or were obtained from or belong to the defendant.

12   Fed. R. Crim. P. 16(a)(1)(E). Specifically, to the extent they were not already produced, the defendant

13   requests copies of all photographs of the defendant, and any other photos taken in connection with this

14   case.

15       (9) <u>Expert Witnesses</u>. The defendant requests the name, qualifications, and a written

16   summary of the testimony of any person that the government intends to call as an expert witness during

17   its case in chief. Fed. R. Crim. P. 16(a)(1)(G). The defense requests that notice of expert testimony be

18   provided at a minimum of two weeks prior to trial so that the defense can properly prepare to address

19   and respond to this testimony, including obtaining its own expert and/or investigating the opinions and

20   credentials of the government's expert. The defense also requests a hearing in advance of trial to

21   determine the admissibility of qualifications of any expert. <u>See Kumho v. Carmichael Tire Co.</u> 119 S.

22   Ct. 1167, 1176 (1999) (trial judge is "gatekeeper" and must determine reliability and relevancy of expert

23   testimony and such determinations may require "special briefing or other proceedings . . . .").

24       (10) <u>Evidence of Bias or Motive to Lie</u>. The defendant requests any evidence that any

25   prospective government witness is biased or prejudiced against the defendant, or has a motive to falsify

26   or distort his or her testimony.

27       (11) <u>Impeachment Evidence</u>. The defendant requests any evidence that any prospective

28   government witness has engaged in any criminal act whether or not resulting in a conviction and whether

1  any witness has made a statement favorable to the defendant.  <u>See</u> Fed. R. Evid. 608, 609 and 613; <u>Brady</u>

2  <u>v. Maryland</u>.

3          (12)  <u>Evidence of Criminal Investigation of Any Government Witness</u>.  The defendant

4  requests any evidence that any prospective witness  is under investigation by federal, state or local

5  authorities for any criminal conduct.

6          (13)  <u>Evidence  Affecting Perception, Recollection, Ability to Communicate, or Truth</u>

7  <u>Telling</u>.  The defense requests any evidence, including any medical or psychiatric report or evaluation,

8  that tends to show that any prospective witness's ability to perceive, remember, communicate, or tell the

9  truth is impaired, and any evidence that a witness has ever used narcotics or other controlled substance,

10  or has ever been an alcoholic.

11          (14)  <u>Jencks Act Material</u>.  The defendant requests production in advance of trial of all

12  material, including any tapes, which the government must produce pursuant to the Jencks Act, 18 U.S.C.

13  § 3500; Fed. R. Crim. P. 26.2.  Advance production will avoid the possibility of delay at the request of

14  the defendant to investigate the Jencks material.  A verbal acknowledgment that "rough" notes constitute

15  an accurate account of the witness' interview is sufficient for the report or notes to qualify as a statement

16  under section 3500(e)(1).  <u>Campbell v. United States</u>, 373 U.S. 487, 490-92 (1963); <u>see also</u> <u>United</u>

17  <u>States v. Boshell</u>, 952 F.2d 1101 (9th Cir. 1991) (holding that where an agent goes over interview notes

18  with subject interview notes are  subject to Jencks Act).

19          (15)  <u>Giglio Information</u>.  Pursuant to <u>Giglio v. United States</u>, 405 U.S. 150 (1972), the

20  defendant requests all statements and/or promises, express or implied, made to any government

21  witnesses, in exchange for their testimony in this case, and all other information which could arguably be

22  used for the impeachment of any government witnesses.

23          (16)  <u>Agreements Between the Government and Witnesses</u>.  In this case, the defendant

24  requests identification of any cooperating witnesses who have committed crimes but were not charged so

25  that they may testify for the government in this case.  The defendant also requests discovery regarding

26  any express or implicit promise; understanding; offer of immunity; past, present, or future compensation;

27  or any other kind of agreement or understanding, including any implicit understanding relating to

28  criminal or civil income tax, forfeiture or fine liability between any prospective government witness and

the government (federal, state and/or local).  This request also includes any discussion with a potential witness about or advice concerning any contemplated prosecution, or any possible plea bargain, even if no bargain was made, or the advice not followed.

Pursuant to United States v. Sudikoff, 36 F. Supp.2d 1196 (C.D. Cal.  1999), the defense requests all statements made, either personally or through counsel, at any time which relate to the witnesses' statements regarding this case, any promises -- implied or express -- regarding punishment/prosecution or detention of these witnesses, any agreement sought, bargained for or requested, on the part of the witness at any time.

(17)  Informants and Cooperating Witnesses.  To the extent that there was any informant the defendant requests disclosure of the names and addresses of all informants or cooperating witnesses used or to be used in this case, and in particular, disclosure of any informant who was a percipient witness in this case or otherwise participated in the crime charged against Mr. Mateo.  The government must disclose the informant's identity and location, as well as the existence of any other percipient witness unknown or unknowable to the defense.  Roviaro v. United States, 353 U.S. 53, 61-62 (1957). The government must disclose any information derived from informants which exculpates or tends to exculpate the defendant.

(18)  Bias by Informants or Cooperating Witnesses.  The defendant requests disclosure of any information indicating bias on the part of any informant or cooperating witness.  Giglio v. United States.  Such information would include what, if any, inducements, favors, payments or threats were made to the witness to secure cooperation with the authorities.

(19)  Residual Request.  Mr. Mateo intends by this discovery motion to invoke his rights to discovery to the fullest extent possible under the Federal Rules of Criminal Procedure and the Constitution and laws of the United States.  Mr. Mateo requests that the government provide his attorney with the above requested material sufficiently in advance of trial to avoid unnecessary delay prior to cross-examination.

//

//

//

07CR3276

# IV.

## REQUEST FOR LEAVE TO FILE FURTHER MOTIONS

After viewing immigration-related documents, such as the A-file or deportation hearing tapes, counsel for Mr. Mateo will likely find it necessary to file further motions, or to supplement existing motions with additional facts.  Counsel may also need to file further depending upon evidence or lack of evidence of <u>Miranda</u> advisal.  Therefore, defense counsel requests the opportunity to file further motions based upon information gained from discovery.

# V.

## CONCLUSION

For the reasons stated above, Mr. Mateo moves this Court to grant his motions.


Respectfully submitted,


*/s/ Amber Baylor*

Dated:  January 11, 2008          **AMBER BAYLOR**
Federal Defenders of San Diego, Inc.
Attorneys for Mr. Miguel Mateo